1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

11

12

13

14

15

16

17

| SUSAN A. STRICKER, | CASE NO.   C04-5593RBL |
| Plaintiff, | REPORT AND RECOMMENDATION |
| v. | |
| JO ANNE B. BARNHART, Commissioner of Social Security, | Noted for November 11, 2005 |
| Defendant. | |

18

19

20

21

22

23

Plaintiff, Susan A. Stricker, has brought this matter for judicial review of the denial of her applications for disability insurance and supplemental security income ("SSI") benefits.  This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Honorable Ronald B. Leighton's review.

FACTUAL AND PROCEDURAL HISTORY

24

25

26

Plaintiff currently is forty-four years old.[1] Tr. 33.  She has a high school education and two years of college training. Tr. 21, 144.  She has past work experience as an administrative clerk, clerk-typist, cashier,

27

28

_____

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

1    and carpenter. Tr. 21, 114.

2         Plaintiff filed applications for SSI and disability insurance benefits on January 25 and February 12,

3    2001, respectively, alleging disability as of September 20, 1996, due to reflex sympathetic dystrophy, a left

4    knee injury and chronic pain. Tr. 20, 84, 138, 414, 416, 423.  Both of her applications were denied initially

5    and on reconsideration. Tr. 20, 33-34, 53, 59, 417, 421, 423-24. Plaintiff requested a hearing, which was

6    held on July 15, 2003, before an administrative law judge ("ALJ"). Tr. 438.  At the hearing, plaintiff,

7    represented by counsel, appeared and testified, as did a vocational expert. Tr. 438-70.

8         On October 1, 2003, the ALJ issued a decision determining plaintiff to be not disabled, finding in

9    relevant part as follows:

10       (1)    at step one of the disability evaluation process, plaintiff had not engaged in
               substantial gainful activity since her alleged onset date of disability;

11

12       (2)    at step two, plaintiff had "severe" impairments consisting of a status post
               anterior cruciate ligament repair, reflex sympathetic dystrophy, and a chronic
               pain syndrome;

13

       (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of
14             those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

15       (4)    at step four, plaintiff had the residual functional capacity to perform a modified,
               but significant, range of sedentary work, which did not preclude her from
16             performing her past relevant work; and

17       (5)    at step five, plaintiff could perform other jobs existing in significant numbers in
               the national economy.

18
     Tr. 21, 27-29.  Plaintiff's request for review was denied by the Appeals Council on July 30, 2004, making
19
     the ALJ's decision the Commissioner's final decision. Tr. 8; 20 C.F.R. §§ 404.981, 416.1481.
20
          On September 17, 2004, plaintiff filed a complaint in this court seeking review of the ALJ's
21
     decision. (Dkt. #1).  Specifically, plaintiff argues that decision should be reversed for an award of benefits
22
     for the following reasons:
23
         (a)    the ALJ erred in finding plaintiff did not have a severe mental impairment;
24
         (b)    the ALJ erred in assessing the opinion of Dr. Margaret E. Bangs, one of
25             plaintiff's treating physicians;

26       (c)    the ALJ erred in evaluating plaintiff's credibility;

27       (d)    the ALJ erred in evaluating the lay witness statement in the record;

28       (e)    the ALJ erred in assessing plaintiff's residual functional capacity; and

(f)    the ALJ erred in finding plaintiff capable of performing her past relevant work, as well as other jobs existing in significant numbers in the national economy.

For the reasons set forth below, however, the undersigned finds the ALJ properly determined plaintiff to be not disabled, and therefore recommends the ALJ's decision be affirmed.

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.    The ALJ Properly Found Plaintiff Had No Severe Mental Impairment

To determine whether a claimant is entitled to disability benefits, the ALJ engages in a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920. At step two, the ALJ must determine if an impairment is "severe". Id. An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a); 20 C.F.R. §§ 416.1520( c), 416.920(a); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that her "impairments or their symptoms affect [her] ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. Smolen, 80 F.3d at 1290.

1    The ALJ determined plaintiff had no severe mental impairment, finding specifically with respect to

2    her allegation of depression that:

3        Although the record contains a diagnosis of depression, this was made in the context of
         a single consultative evaluation which was based largely on subjective reporting (Exhibit
4        B11F). The record fails to indicate that the claimant's abilities to think, understand,
         remember, communicate, concentrate, get along with other people, or handle normal
5        stress are seriously impaired, and she has never sought psychiatric counseling or
         inpatient care during the period at issue. Attended by no more than minimal limitation
6        of twelve months duration, this condition is found to be "non-severe."

7    Tr. 21-22. Plaintiff argues that the ALJ erred in so finding, and that his determination on this issue is not

8    supported by the substantial evidence in the record. The undersigned disagrees.

9    The medical evidence in the record regarding plaintiff's alleged depression is mixed. Plaintiff was

10   diagnosed by Lauren Schwartz, Ph.D., in mid-January 1998, as having a chronic pain disorder "associated

11   with both psychological factors and a general medical condition" and a global assessment of functioning

12   ("GAF") score of 50. Tr. 214. On examination, Dr. Schwartz found plaintiff to be "alert and oriented, with

13   a friendly, bright, and somewhat dramatic presentation," and to have good eye contact. Tr. 208. Plaintiff

14   denied having any difficulty falling asleep, and despite "multiple stressors," she described her mood as

15   "normal." Tr. 208, 212. Although plaintiff endorsed "constant fatigue and a reduced sense of" pleasure and

16   enjoyment, she denied "most symptoms of depression," anxious rumination or panic attacks. Tr. 212.

17   Indeed, psychological testing suggested only "mild mood disturbance." Id.

18   Plaintiff was evaluated by Dr. Norman F. Peterson in early April 1999. Plaintiff told Dr. Peterson

19   that she had "gradually had an onset of depression," but that "[t]o date" she had "not been prescribed any

20   antidepressants or had any psychotherapy," even though antidepressants had been discussed "at a recent

21   pain clinic visit." Tr. 254. She described herself as "feeling anxious and depressed much of the time," and

22   her affect was noted to be that of a "serious[ly] depressed person," which was found to be "congruent with

23   her reported moods." Tr. 255. While plaintiff admitted to occasional thoughts of suicide, she denied any

24   intent or any thoughts of harming others. Tr. 255-56. There was no sign of delusions, and she was oriented

25   and had "good memory for recent and past events." Id. Her concentration also appeared to be largely

26   intact. Tr. 256. Dr. Peterson diagnosed plaintiff with major depression and a GAF score of "45 to 50," and

27   found her prognosis to be "guarded." Tr. 257.

28   Based on Dr. Peterson's evaluation, Trevelyan Houck, Ph.D., and Thomas Clifford, Ph.D., two non-

examining consulting psychologists, completed a mental residual functional capacity assessment form, in which they found plaintiff moderately limited in her ability to: maintain attention and concentration; complete a normal workday and workweek; perform at a consistent pace; interact appropriately with the general public; and respond appropriately to changes in the work setting. Tr. 348-49.  At the same time, however, Dr. Houck and Dr. Clifford also completed a psychiatric review technique form, in which they indicated plaintiff had a severe depressive syndrome, but deemed her to have only slight restrictions in her activities of daily living, to have slight difficulties in maintaining social functioning, and to seldom have deficiencies of concentration, persistence or pace. Tr. 352, 355, 359.  They also found insufficient evidence of episodes of decompensation or deterioration in the work place. Tr. 359.

Plaintiff asserts the reports of Drs. Peterson, Houck and Clifford support her allegation that she has a severe mental impairment consisting of depression.  While it is questionable for the ALJ to discount Dr. Peterson's opinion because it is based largely on plaintiff's subjective reporting,[2] the substantial evidence in the record supports the ALJ's determination of non-severity.  As noted above, the record contains the opinion of Dr. Schwartz, who found plaintiff had only a "mild mood disturbance" based on psychological testing. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (where opinion of examining physician is based on independent clinical findings, it is within ALJ's discretion to disregard conflicting opinion in another examining physician's diagnosis).  Further, plaintiff described her mood as "normal" and denied having any symptoms of depression, despite "multiple stressors."

Although plaintiff told Dr. Peterson that she had a "gradual" onset of depression, and Dr. Peterson diagnosed her as having depression, she also denied having received any counseling or been prescribed any antidepressant medication to date.  Treatment notes in the record further show significant improvement in plaintiff's mood at the time of and subsequent to Dr. Peterson's evaluation.  For example, in early April 1999, plaintiff was noted by one of her treating physicians to be "very upbeat." Tr. 302.  In early July 1999, she was described as being "happy and active." Tr. 298.  Another treating physician described plaintiff in mid-May 2001 as being "[a]nimated, cheerful, enthusiastic." Tr. 325.  In early June 2001, she was noted to

---

[2]The diagnoses and observations of psychiatrists and psychologists constitute competent evidence when mental illness is the basis of a disability claim. Sanchez v. Apfel, 85 F. Supp.2d 986, 992 (C.D. Cal. 2000) (citation omitted); see also Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (opinion based on clinical observations supporting diagnosis of depression is competent psychiatric evidence).

1  be "cheerful," "talkative," and "animated." Tr. 323.  Similar observations concerning plaintiff's demeanor

2  were made in late June and early July 2001, as well. Tr. 320, 322.

3          The medical record also fails to definitively show that plaintiff's depression resulted in significant

4  work-related limitations.  Although a GAF score of 45 to 50 may be indicative of a serious impairment in an

5  individual's social and/or occupational functioning, Dr. Peterson did not expressly state that plaintiff had

6  any specific work-related limitations resulting from the diagnosis he gave her.  Further, while Drs. Houck

7  and Clifford reported that she had several moderate mental functional limitations on their mental residual

8  functional capacity assessment form, they stated that she had only slight limitations in those areas on the

9  psychiatric review technique form that was completed at the same time.

10          Plaintiff's argument that there is no discrepancy between these forms with respect to the mental

11  functional limitations noted therein is without merit.  The Social Security Regulations specifically state that

12  the four functional areas set forth in the "rating of impairment severity" section of the psychiatric review

13  technique form (Tr. 359) are to be used at step two of the disability evaluation process to determine if an

14  impairment is severe. 20 C.F.R. § 404.1520a(c), (d); 20 C.F.R. § 416.920a(c), (d); SSR 96-8p, 1996 WL

15  374184 *4.  As it is reasonable for an ALJ to rely on the information in both forms to determine the level of

16  severity of a claimant's mental impairments, there clearly is contradictory evidence here.

17          For the same reason, plaintiff's argument that a finding of severity is required based on the fact that

18  Dr. Houck and Dr. Clifford checked the box indicating a severe impairment was present in the "medical

19  summary" section of the psychiatric review technique form (Tr. 352), and that they noted moderate mental

20  functional limitations on the mental residual functional capacity form, also lacks merit.  The limitations set

21  forth in the "rating of impairment severity" section of the same psychiatric review technique form provides a

22  better, more detailed basis for an ALJ to determine the severity of a claimant's mental impairment, than

23  does the medical summary section.  Given the conflicting evidence contained in the two forms regarding the

24  severity of plaintiff's mental functional limitations, and in light of the other medical evidence in the record

25  discussed above, it thus was not unreasonable for the ALJ to find no definitive indication plaintiff suffered

26  from significant work-related limitations due to her depression.  Reddick v. Chater, 157 F.3d 715, 722 (9th

27  Cir. 1998) (ALJ is responsible for resolving conflicts in evidence);  Sample v. Schweiker, 694 F.2d 639, 642

28  (9th Cir. 1982) (resolution of conflicts solely function of ALJ).

1    II.    The ALJ Did Not Err in Evaluating the Opinion of Dr. Bangs

2          The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

3    medical evidence. Reddick, 157 F.3d at 722.  Where the medical evidence in the record is not conclusive,

4    "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample, 694 F.2d at

5    642.  In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security

6    Administration, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical

7    evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to

8    discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

9          In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

10   supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

11   detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

12   thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence."

13   Sample, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the

14   ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

15         The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

16   either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

17   treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

18   legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the

19   ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739

20   F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

21   why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

22   (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

23         In general, more weight is given to a treating physician's opinion than to the opinions of those who

24   do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

25   a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings."

26   Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th

27   Cir. 2001); Magallanes, 881 F.2d at 75.  An examining physician's opinion is "entitled to greater weight

28   than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A nonexamining physician's

opinion may constitute substantial evidence if "it is consistent with other independent evidence in the

REPORT AND RECOMMENDATION
Page - 7

1   record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

2       Dr. Margaret E. Bangs, plaintiff's most recent treating physician, opined on several occasions that

3   plaintiff was incapable of performing even sedentary work. Tr. 318, 339, 369-72.  The ALJ rejected those

4   opinions for the following reasons:

5       Only Dr. Bangs has opined that the claimant is unable to engage in any work activity due
        to reflex sympathetic dystrophy and other ailments (Exhibit B18F; B33).  However,
6       there is no support in her own progress notes for these checkbox opinions which are
        also inconsistent with the rest of the record and appear more of an accommodation than
7       anything else.  She states in an August 2001 letter that the claimant has obvious, grossly
        visible atrophy of the muscles of her lower extremity (Exhibit B19F), yet a careful
8       examination of the record specifically documents improvement in muscular atrophy
        (Exhibit B14F:8, May 1999, 2.5cm atrophy; Exhibit B14F:2, January 2001, 1.5 cm
9       atrophy; Exhibit B16F:10, May 2000 notation of mild atrophy).  Dr. Bangs makes no
        specific measurements in her own progress notes, leaving great doubt as to the basis of
10      her characterization regarding the claimant's condition.  She also mentions "trophic"
        changes in the claimant's leg, but the January 2003 report from Northwest Pain
11      Specialists specifically notes that there are no trophic skin changes (Exhibit B34F).
        Again, Dr. Bangs makes no mention of this in her own progress notes.  Further, Dr.
12      Bangs only treated the claimant from April 2001 until her letter of July 2001, and during
        that period noted activities such as hiking, cleaning, etc. which are wholly inconsistent
13      with her opinion letter.  In sum, Dr. Bangs [sic] opinion is based on short-term treatment
        with no objective basis in her own treatment notes to support her opinion, which in itself
14      is contradictory to her observations and those of others.  I give it no weight.

15  Tr.. 26-27.  The undersigned finds the ALJ's determination on this issue to be supported by the substantial

16  evidence in the record.

17      As noted by the ALJ, every physician in the record who gave an opinion as to plaintiff's ability to

18  work, other than Dr. Bangs, found her capable of performing at least a modified range of sedentary work.

19  For example, in late October 1997, Dr. Richard G. McCullom examined plaintiff, and believed she could

20  "work in sedentary type jobs," and could even do "a light duty clerical position." Tr. 205.  In late February

21  1999, Dr. J. Dalton, a non-examining consulting physician, also found plaintiff capable of sedentary work

22  with certain additional postural limitations. Tr. 340-47.  Substantially similar opinions were provided by Dr.

23  Linda Miller, another non-examining consulting physician, in late November 1999, Dr. Robert L. Scott,

24  who treated plaintiff for nearly two years, in early December 2000, and Dr. Robert G. Hoskins, also a non-

25  examining consulting physician, in early April 2001. Tr. 270-71, 307-14, 361-68.

26      Plaintiff argues that Dr. Scott's opinion actually shows she is incapable of performing the full range

27  of sedentary work.  It is true that Dr. Scott noted plaintiff was not able to go up and down stairs well due to

28  her left leg being "insecure." Tr. 271.  The ALJ, however, assessed her with a residual functional capacity to

perform a modified range of sedentary work, finding specifically that she was limited with respect to her ability to use ladders and stairs "secondary to her left knee condition." Tr. 26. Thus, Dr. Scott's opinion is consistent with the ALJ's findings. Plaintiff also points to an early May 2000 report, in which Dr. Scott stated she was restricted to sedentary work, with limited standing and walking. Tr. 276. Again, while true, this report is not inconsistent with the ALJ's residual functional capacity assessment. See Tr. 26. As such, it is not, as plaintiff asserts, consistent with the opinions of Dr. Bangs, who repeatedly stated that she was "[s]everely limited" (defined as "[u]nable to lift at least 2 pounds or unable to stand and/or walk.") in her ability to work at least half time or that she could not work at all. Tr. 318, 339, 370, 372.

Plaintiff further argues Dr. McCullom's opinion regarding sedentary work cannot be relied upon in that it was undercut by his diagnosis that she did not have reflex sympathetic dystrophy. Tr. 205. Although it appears that in light of the weight of the other medical evidence in the record Dr. McCullom was wrong regarding plaintiff's diagnosis, his opinion that plaintiff was capable of working in "sedentary type jobs" is not incompatible with the majority of the other medical sources in the record who also found her to be able to perform at that level. Further, in late January 2001, Dr. Margaret M. Baker, examined plaintiff, stating that she needed "aggressive rehabilitation," but that she would be "qualified for a sedentary type of job." Tr. 275. Plaintiff argues this opinion more accurately indicates that Dr. Baker felt plaintiff would be so qualified only after the aggressive rehabilitation had been completed. However, the opposite conclusion is also equally valid. Allen, 749 F.2d at 579 (if evidence admits of more than one rational interpretation, court must uphold Commissioner's decision). In any event, even if plaintiff's interpretation were to be adopted, as discussed above, the weight of the medical opinion evidence in the record indicates she is capable of the kind of modified sedentary work the ALJ determined she could do.

In addition, the record indicates that Dr. Bangs only treated plaintiff for a short period of time and there appears to be little in Dr. Bangs' diagnostic notes from that period to support her multiple opinions finding plaintiff disabled. Plaintiff argues Dr. Bangs continued to provide management of her care, as evidenced by her referral by Dr. Bangs to a pain management specialist in January 2003. It is true that Dr. Louis C. Saeger, the pain management specialist, did state in his late January 2003 report that plaintiff had been referred to him by Dr. Bangs. Tr. 373. It also is true that Dr. Bangs stated in an early September 2002 letter that she had been treating plaintiff for her reflex sympathetic dystrophy. Tr. 339. However, the most

1    recently dated diagnostic note from Dr. Bangs in the record is one from early July 2001. Tr. 320.  Other

2    than Dr. Saeger's statement that Dr. Bangs had referred plaintiff to him, there is no evidence in the record

3    that Dr. Bangs in fact continued to manage plaintiff's care after early July 2001.[3]

4            The record does contain a state agency physical evaluation form completed by Dr. Bangs in early

5    December 2002. Tr. 369-70.  Again, this form evaluation was provided almost one and a half years after the

6    record indicates Dr. Bangs last treated plaintiff.  In addition, that evaluation appears to have been done

7    solely for disability evaluation purposes.  Plaintiff also refers to another state agency physical evaluation

8    form completed by Dr. Bangs in early December 2003, in which Dr. Bangs once more opined that she was

9    incapable of performing even sedentary work. Tr. 428-32.  That evaluation, however, was submitted for the

10   first time to the Appeals Council, not to the ALJ.  Thus, the ALJ did not have the opportunity to review it.

11   Plaintiff also has not set forth any reason why the court should now review that evidence.  Indeed, it is not

12   at all clear this court has the authority to do so without a showing of "good cause" by plaintiff. See Mayes

13   v. Massanari, 276 F.3d 453, 461-63 (9th Cir. 2001) (stating that issue of whether "good cause" is required

14   to review new evidence submitted for the first time to the Appeals Council has not yet been decided).  The

15   court, therefore, declines to consider it here.

16           Other than containing the observations that plaintiff sat in a chair with her feet propped up during

17   the examinations and moved slowly and stiffly, the diagnostic notes from Dr. Bangs that are in the record

18   show little in the way of objective clinical findings. See Tr. 320, 322-23, 325, 330.  Those diagnostic notes

19   also are replete with references to plaintiff's increasing ability over time to engage in physical activity. See

20   Id.  Plaintiff argues there is mention in those notes that she reported having increased aches and pains due to

21   over-exertion at times. Tr. 322, 325.  While true, those notes also show she continued to engage in such

22   activities, and, at the very least, her ability to engage in those activities contradicts Dr. Bangs' opinions that

23   she is severely limited (unable even to stand and/or walk) in her ability to work.  Plaintiff argues the very

24   fact that she moved slowly and stiffly and propped her feet up during the examinations supports Dr. Bangs'

25   opinions.  That fact, however, simply highlights the discrepancy between plaintiff's behavior during the

26   examinations and the activities she reported engaging in outside thereof.

27

28           [3]While plaintiff argues she testified that she began seeing a new physician in January 2003, after Dr. Bangs left the area,
     that testimony does not indicate when Dr. Bangs actually left the area, nor does it establish that Dr. Bangs actually continued to
     treat her and/or manage her care up until that time. Tr. 441-42.

1    Lastly, plaintiff takes issue with the ALJ in discounting Dr. Bangs' opinions due to inconsistencies

2    between her statements regarding muscle atrophy and other medical evidence in the record concerning that

3    issue.  Specifically, plaintiff asserts Dr. Bangs noted in early December 2002, that she had a two centimeter

4    muscle atrophy in the left thigh, not inconsistent with the finding of Dr. Baker in mid-May 1999. Tr. 279,

5    369.  As discussed above, there is a question as to the credibility of that early December 2002 evaluation.

6    Further, as noted by the ALJ, measurements taken by other medical sources in the record show a gradual

7    decrease in the size of the atrophy.  Therefore, while Dr. Bangs' treatment records may not be internally

8    inconsistent in this regard, especially since they contain only one such measurement, they are not consistent

9    with the other medical evidence in the record.  Although plaintiff downplays the January 2003 finding of Dr.

10   Saeger that plaintiff had "no gross muscle wasting" (Tr. 375), it is generally consistent with the other

11   medical evidence in the record indicating decreasing atrophy.

12   III.    The ALJ Properly Evaluated Plaintiff's Credibility

13       Questions of credibility are solely within the control of the ALJ.  Sample, 694 F.2d at 642.  The

14   court should not "second-guess" this credibility determination.  Allen, 749 F.2d at 580.  In addition, the

15   court may not reverse a credibility determination where that determination is based on contradictory or

16   ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should

17   properly be discounted does not render the ALJ's determination invalid, as long as that determination is

18   supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

19       To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

20   disbelief." Lester, 81 F.3d at 834 (9th Cir. 1996).  The ALJ "must identify what testimony is not credible and

21   what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834; Dodrill v. Shalala, 12 F.3d

22   915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons

23   for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834.  The evidence

24   as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

25

26       In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

27   evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

28   testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

1    also may consider a claimant's work record and observations of physicians and other third parties regarding

2    the nature, onset, duration, and frequency of symptoms. Id.

3          The ALJ discounted plaintiff's credibility in part due to inconsistencies between her allegations of

4    disabling symptoms and the objective medical evidence in the record. Tr. 25.  A determination that a

5    claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing

6    requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998).  As discussed

7    above, the ALJ did not err in rejecting the opinions of Dr. Bangs that plaintiff was incapable of performing

8    even sedentary work.  Instead, the ALJ properly found the weight of the medical evidence in the record

9    showed plaintiff indeed could perform a modified range of sedentary work.  As such, the ALJ did not err in

10   discounting her credibility for this reason.

11         The ALJ also discounted plaintiff's credibility in part because she "exhibited a discrepancy in the

12   degree of limp" she had during formal physical testing. Tr. 25.  The ALJ may consider the observations of

13   physicians regarding a claimant's symptoms, as well as use other "ordinary techniques of credibility

14   evaluation." Smolen, 80 F.3d at 1284.  Dr. McCullom reported that during "various phases of gait testing,"

15   plaintiff showed "a discrepancy in the degree of limp" that she had. Tr. 205.  Although alone this may not be

16   sufficient to discount plaintiff's credibility, in combination with the other reasons set forth by the ALJ

17   discussed herein, the ALJ did not err in considering it.  Indeed, one examining physician noted that "there

18   were several inconsistencies" in plaintiff's "report across treatment providers," that raised the possibility

19   that she "may not have been entirely forthright." Tr. 213.  Another apparently felt that plaintiff did "not

20   present an accurate history" and was "manipulative." Tr. 263.

21         In addition, an ALJ may rely on a claimant's demeanor at the hearing as a basis for discrediting his

22   or her testimony. Thomas v. Barnhart, 278 F.3d 947, 960 (9th Cir. 2002); Matney v. Sullivan, 981 F.2d

23   1016, 1020 (9th Cir. 1992).  Inclusion of personal observations of the claimant in the ALJ's findings "does

24   not render the decision improper." Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  However, the

25   ALJ may not reject a claimant's subjective complaints "solely on the basis of" personal observations. SSR

26   95-5p, 1995 WL 670415 *2.

27         Here, the ALJ found that plaintiff's "presentation at the hearing evidenced marked pain behaviors

28   which seemed way out of proportion to her objective medical history or reported activities." Tr. 25.  The

1    ALJ further noted that plaintiff "was able to sit for the duration of the hearing after her dramatic initial

2    presentation." Id.  Plaintiff argues the ALJ failed to note that she sat through the entire hearing with her feet

3    elevated on a chair.  While the record indicates that plaintiff did so at the beginning of the hearing (Tr. 443),

4    it does not show that she did so for the entire time.  Even so, however, plaintiff fails to show how doing so

5    discredits the ALJ's observations regarding her marked pain behaviors.

6          The ALJ discounted plaintiff's credibility in part for the following reason:

7          I also note that the claimant has provided various inconsistent reports of prior substance
           abuse.  She told the consultative psychological examiner in April 1999 that she had no
8          history of alcohol abuse and only occasionally drank "one or two beers" (Exhibit
           B11F:1).  However, in May 1999 she reported drinking at least a six-pack of beer per
9          week (Exhibit B14F:7).  In March 2000, she called Dr. Scott's office to cancel an
           appointment so that she could go to the liquor store.  She had called the previous day
10         with an intoxicated and belligerent tone (Exhibit B16F:13).  More recently, the claimant
           admitted to Dr. [Ethan] Berke at the Jamestown Family clinic that she was a "heavy"
11         drinker until 2000 (Exhibit B35F:14).  Yet, two months earlier during her consultation
           with Northwest Pain Specialists, she denied any history of substance abuse (Exhibit
12         B34F:2).

13   Tr. 25-26.  The ALJ may consider prior inconsistent statements and other testimony that "appears less than

14   candid." Smolen, 80 F.3d at 1284.  As the detailed summary provided by the ALJ shows, plaintiff has not

15   been entirely truthful concerning her prior alcohol abuse.  Thus, here too, the ALJ properly discounted her

16   credibility for this reason.

17         Finally, the ALJ discounted plaintiff's credibility due to her activities of daily living:

18         Regarding the claimant's daily activities, the record indicates that the claimant originally
           moved to Washington State to attend college.  She obtained a disabled parking tag for
19         her automobile in January 1999 (Exhibit B9F:4), and presumably continues to drive.
           She went on a trip to California in March 2000 to visit her family for a month (Exhibit
20         B16F:12), and was noted in May 2001 to be able to visit with neighbors and perform
           limited yard work (Exhibit B19F:9).  She walks one-eighth mile in a loop on occasion,
21         and has been able to do laundry and clean her home and fish tanks (Exhibit B19F:7).
           Although these isolated reports are only indicators of the claimant's actual functional
22         abilities, it does appear that she is capable of participating in affairs and activities which
           interest her and which she wants to be involved in.  Such activities, while not directly in
23         correlation with work duties, do indicate a capacity to engage in exertional activities
           consistent with assessed abilities.

24
25   Tr. 25.  To determine whether a claimant's symptom testimony is credible, the ALJ also may consider his or

26   her daily activities.  Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to

27   spend a substantial part of his or her day performing household chores or other activities that are

28   transferable to a work setting." Id. at 1284 n.7.  The claimant, however, need not be "utterly incapacitated"

     to be eligible for disability benefits, and "many home activities may not be easily transferable to a work

REPORT AND RECOMMENDATION
Page - 13

1  environment." Id.

2      It not entirely clear that the activities outlined by the ALJ above shows that plaintiff is able to spend

3  a substantial part of her day performing household chores or other activities that are transferable to a work

4  setting.  Nevertheless, the fact that one of the reasons for discounting her credibility should be discounted,

5  does not render the ALJ's determination on this issue invalid, as long as that determination is supported by

6  substantial evidence, as it is here. Tonapetyan, 242 F.3d at 1148.  As such, the undersigned finds the ALJ's

7  stated reasons for discounting plaintiff's credibility to be proper.

8  IV.    The ALJ Properly Evaluated the Lay Witness Statement in the Record

9      Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into

10  account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to

11  each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay

12  testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

13  1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting

14  lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for

15  dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those

16  reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may

17  "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

18      The record contains a statement from plaintiff's roommate, which the ALJ found to be supportive of

19  her pain complaints and allegations regarding her ability to function. Tr. 24, 472-75.  However, the ALJ

20  declined to give significant weight to that statement to the extent that it was "inconsistent with the findings

21  established" in his decision. Tr. 26.  As discussed above, the ALJ properly found the medical evidence in the

22  record did not support plaintiff's allegations of disabling pain and other symptoms.  Although the ALJ did

23  not mention that specific finding here, the court notes that it may draw legitimate inferences from the ALJ's

24  decision. Magallanes, 881 F.2d at 755.  Here, the court finds it reasonable to infer that in referring to "the

25  findings established by" his decision, the ALJ necessarily included therein his findings with respect to the

26  medical evidence in the record as well.

27      The ALJ also found that the roommate's statement was "clearly slanted by the information" given to

28  her by plaintiff that appeared to be unreliable. Id.  Plaintiff argues it was inappropriate for the ALJ to

REPORT AND RECOMMENDATION
Page - 14

discount the lay witness statement because he found her own testimony lacked credibility, citing to <u>Dodrill</u> <u>v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993).  In <u>Dodrill</u>, the Ninth Circuit reversed the ALJ's decision to discount the credibility of the lay witness statements in the record based on his finding that the claimant also was not credible, because the ALJ "may have been under the mistaken impression that lay witnesses can never make independent observations of the claimant's pain and other symptoms." <u>Id.</u>  The Court of Appeals noted, however, that such a determination may be proper with respect to those lay witnesses whose statements do "not fully explain sufficiently when and to what extent they had the opportunity to observe" the claimant. <u>Id.</u> at 918.

Here, the statement provided by plaintiff's roommate focused primarily on the history of plaintiff's medical problems and her efforts to recover therefrom.  The roommate's statement contains little in the way of the her own personal observations of plaintiff's pain complaints and other symptoms.  Nor is there any indication in that statement as to how often the roommate actually sees plaintiff or is able to observe her during the day.  This is particularly important here in that the roommate worked during the relevant time period.  Accordingly, the undersigned finds the ALJ did provide germane reasons for discrediting the lay witness statement in the record.

V.      <u>The ALJ Did Not Err in Assessing Plaintiff's Residual Functional Capacity</u>

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. <u>Id.</u> Residual functional capacity thus is what the claimant "can still do despite his or her limitations." <u>Id.</u>

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. <u>Id.</u>  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." <u>Id.</u>  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." <u>Id.</u>  In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

1   medical or other evidence." Id. at *7.

2       Here, the ALJ assessed plaintiff with the following residual functional capacity:

3       Given the record as a whole, I find that the claimant retains the physical residual
        functional capacity to perform sedentary work, or work which involves lifting no more
4       than 10 pounds at a time and occasionally lifting or carrying articles like docket files,
        ledgers, and small tools.  The claimant is limited to 15-20 minutes walking or standing,
5       and is unable to perform work tasks requiring the use of foot controls, ladders, stairs, or
        traversing rough ground secondary to her left knee condition and residual pain.

6
    Tr. 26.  Plaintiff argues the above residual functional capacity assessment was improper because the ALJ
7
    erred in evaluating her credibility.  As discussed above, however, the ALJ gave several valid reasons for
8
    discounting plaintiff's credibility regarding her pain complaints and symptom testimony, and his credibility
9
    determination as a whole is supported by substantial evidence.
10
        Plaintiff also argues the ALJ erred in not including the additional limitation that she was required to
11
    elevate her feet at will throughout the day to alleviate pain.  In support of this argument, plaintiff points to
12
    her own testimony regarding an inability to sit in a normal fashion with her feet being constantly elevated,
13
    and to the observations in Dr. Bangs' diagnostic notes that plaintiff sat in a chair with her feet propped up
14
    on another chair during examinations.  Again, however, as discussed above, the ALJ properly discounted
15
    plaintiff's credibility regarding her pain complaints and symptom testimony.  Also as discussed above, the
16
    fact that Dr. Bangs' diagnostic notes indicate plaintiff propped her feet up during examinations, yet at the
17
    same time show that she was increasing her activity level outside of the examination room, highlights the
18
    discrepancy between her subjective complaints and the objective medical evidence in the record regarding
19
    her actual physical limitations.
20
        The ALJ expressly addressed plaintiff's alleged need to constantly prop her feet up as follows:
21
        If she were required to elevate her legs throughout the day, she would be incapable of
22      the work outlined above.  However, I find no substantial evidence that she needs to.
        Given her fairly decent activities at times, she appears quite capable of getting out and
23      doing things without elevating her legs if need be.  I note that most treating sources have
        recommended an activity increase for the claimant throughout the period in question.
24
    Tr. 27.  While, as discussed above, the evidence in the record regarding plaintiff's activities of daily living
25
    may not in themselves be sufficient to fully discount her credibility, they do indicate, as the ALJ points out,
26
    that she at times has shown the ability to engage in activities at a level far above what would be considered
27
    disabling.  For example, she told Dr. Bangs in mid-May 2001, that she "[w]as able to get out of the house
28
    and across the street to her neighbors several times, as well as do yard work." Tr. 325.  In early June 2001,

REPORT AND RECOMMENDATION
Page - 16

1   she reported having done "several loads of laundry," cleaned her room, dusted and moved things around,

2   and cleaned the fish tank. Tr. 323.  Later that month she went fishing, reporting that she was able to stand

3   at the side of the river while doing so. Tr. 322.

4         In addition, the record further indicates that plaintiff was told consistently to increase her physical

5   activity as the best means for treating her reflex sympathetic dystrophy, rather than to constantly remain in a

6   sedentary position or to keep her leg propped up throughout the day.  In late March 1997, Dr. Richard D.

7   Thompson told her "to do whatever exercises she can for strengthening." Tr. 201.  In mid-January 1998,

8   physical therapy was noted to be "the most treatment recommendation" for her. Tr. 215.  That sentiment

9   was reiterated again in both late March and early June 1998 (Tr. 224, 227), and by Dr. Baker in late May

10   1999 and early January 2001. Tr. 275, 280.

11         Dr. Scott repeatedly encouraged plaintiff to exercise and engage in physical therapy. Tr. 288, 292,

12   298-99, 303-04.  In early September 2000, he told plaintiff that she could only "get over" her problems "by

13   desensitizing her leg to activity" which required that she use it. Tr. 287.  In early December 2000, Dr. Scott

14   again told her to "do anything more" in terms of physical activity, and that "not doing something every day

15   is leading to muscle wastage and diminishing returns." Tr. 285.  Even Dr. Bangs felt plaintiff should "get

16   out of the house and do things on a more regular basis." Tr. 325.  In late June and early July 2001, she told

17   her to continue her "daily walking" and her "increased activity." Tr. 320, 322.  Therefore, the ALJ did not

18   err in finding the evidence in the record failed to support plaintiff's alleged need to keep her leg propped up

19   throughout the day.

20   VI.   The ALJ's Analysis at Steps Four and Five of the Disability Evaluation Process Were Proper

21         An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

22   posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

23   1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

24   medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

25   Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by

26   the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that

27   description those limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)

28   (because ALJ included all limitations that he found to exist, and those findings were supported by

1    substantial evidence, ALJ did not err in omitting other limitations claimant failed to prove).

2        Here, as discussed above, the ALJ found that plaintiff retained the residual functional capacity to

3    perform a modified range of sedentary work.  At the hearing, the ALJ posed a hypothetical question to the

4    vocational expert containing substantially the same information as he included in his residual functional

5    capacity assessment of plaintiff. Tr. 464-65.  Based on that hypothetical question, the vocational expert

6    testified that plaintiff could return to her past relevant work and perform other jobs existing in significant

7    numbers in the national economy. Tr. 465-68.  Accordingly, because, also as discussed above, the ALJ did

8    not err in assessing plaintiff's residual functional capacity, he properly found plaintiff to be not disabled, and

9    thus not entitled to disability insurance or SSI benefits.

10                                   CONCLUSION

11       Based on the foregoing discussion, the court should find the ALJ properly concluded plaintiff was

12   not disabled, and should affirm the ALJ's decision.

13       Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

14   the parties shall have ten (10) days from service of this Report and Recommendation to file written

15   objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

16   objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit

17   imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **November 11,**

18   **2005**, as noted in the caption.

19       DATED this 14th day of October, 2005.

20

21

22

23                                   Karen L. Strombom
                                     United States Magistrate Judge
24

25

26

27

28

REPORT AND RECOMMENDATION
Page - 18